THE PEOPLE OF THE STATE OF NEW YORK, Appellant, *v.*
AMERICAN WOOL STOCK CORPORATION, Respondent.
THE PEOPLE OF THE STATE OF NEW YORK, Appellant, *v.*
B. D. KAPLAN & CO., INC., Respondent.

Argued May 22, 1941; decided July 29, 1941.

William C. Chanler, Corporation Counsel (Paxton Blair and Fred Iscol of counsel), for appellant. The defendants were proved beyond a reasonable doubt to be dealers in rags, in the ordinarily accepted sense of that word. Their conviction should have been sustained. (People v. Tilford, 268 N. Y. 557.) The provision requiring junk dealers to be licensed is constitutional, even when applied to the defendants. (People v. Star Metal Smelting & Refining Co., 274 N. Y. 617; Gundling v. Chicago, 177 U. S. 183; Rosenthal v. New York, 226 U. S. 260; City of St. Louis v. Baskowitz, 273 Mo. 543; Commonwealth v. Hood, 183 Mass. 196; State v. Shapiro, 131 Md. 168; Lewis v. Quinn, 217 Cal. 410.)

William T. Griffin, Joseph V. McKee, Gilbert Lazerus and Alfonse F. Spiegel for respondents. Regulation of the junk business under the police power is justified only where its purpose and effect is to control a business which provides a market for stolen property. (People v. Rosenthal, 197 N. Y. 394; 226 U. S. 260; City of New York v. Vandewater, 113 App. Div. 456; People v. McGuire, 113 App. Div. 631; Matter of Dening v. Cooke, 162 Misc. Rep. 723; Co-operative Junk Co. v. Police Comrs., 38 Cal. App. 676; Commonwealth v. Silverman, 220 Mass. 552; Westside Metal Refining Co. v. Chicago, 140 Ill. App. 599; 239 Ill. 341; Grand Rapids v. Braudy, 105 Mich. 670; City of Duluth v. Bloom, 55 Minn. 97; Marmet v. State, 45 Ohio St. 63.) The business of the defendants does not provide a market for stolen property, and there is, therefore, no warrant in fact for the application of the police power to their business. (City of Chicago v. Northern Paper Stock Co., 337 Ill. 194; Commonwealth v. Silverman, 220 Mass. 552.) Regulation of junk dealers does not extend to dealers whose business is similar to that of defendants. (City of New York v.

*Vandewater*, 113 App. Div. 456; *Matter of Trosk* v. *Cohen*, 262 N. Y. 430; *City of Chicago* v. *Northern Paper Stock Co.*, 337 Ill. 194; *City of Chicago* v. *Lowenthal*, 242 Ill. 404; *Westside Metal Refining Co.* v. *City of Chicago*, 140 Ill. App. 599; 239 Ill. 341.) The statute does not include dealers whose business consists of processing and whose purchases of new or old woolen materials are merely incidental to that business. (*People* v. *Wurlitzer Co.*, 282 N. Y. 457; *People* v. *Katz*, 156 Misc. Rep. 65; *City of Chicago* v. *Iroquois Steel & Iron Co.*, 284 Ill. App. 561; *City of Chicago* v. *Northern Paper Stock Co.*, 337 Ill. 194; *Westside Metal Refining Co.* v. *City of Chicago*, 140 Ill. App. 599; *City of Chicago* v. *Lowenthal*, 242 Ill. 404.)

LEWIS, J. The business of junk dealers in the city of New York is made the subject of regulation by the Administrative Code [L. 1937, ch. 929], ch. 32, title B, article 18, of which section B32–114.0 provides (p. 1110): " It shall be unlawful for any person to act as a junk dealer without a license therefor." The Code also defines a " junk dealer " as "Any person engaged in the business of purchasing or selling junk, old rope, old iron, brass, copper, tin, lead, rubber, paper, rags, bagging, slush or empty bottles." A " junk shop " is " The place of business of a junk dealer." (§ B32–113.0 [p. 1110].)

The defendants were charged with having engaged in business as junk dealers without procuring licenses, in violation of the statute quoted above. They were tried together in Magistrates' Court and were convicted. Upon appeal to the Court of Special Sessions the judgments of conviction were unanimously reversed, on the law. The present appeal by the People is taken by permission of a judge of this court.

Experience has taught that the various types of property dealt in by a junk dealer are peculiarly susceptible to theft and that the business of junk dealers, which provides a market for stolen property, is of a character which warrants regulation in the exercise of police power. Regulatory

statutes enacted to that end have successfully withstood attacks as to their constitutionality. (*People* v. *Rosenthal*, 197 N. Y. 394, 400; affd., 226 U. S. 260, 270; *People* v. *Star Metal Smelting & Refining Co.*, 274 N. Y. 617; *Commonwealth* v. *Hood*, 183 Mass. 196, 198, and see *Gundling* v. *Chicago*, 177 U. S. 183, 188; *People* v. *Ringe*, 197 N. Y. 143, 146, 147.) Believing that the licensing statute here involved is a valid exercise of police power, we pass directly to the question whether it was intended to apply to the type of business conducted by the defendants.

The record does not leave us in doubt as to the sources from which come the waste materials dealt in by the defendants. Of the total quantity of materials purchased by the defendant American Wool Stock Corporation, twenty-five per cent are new wool " clips " — small waste pieces from the cutting tables of manufacturers of sweaters, men's clothes and women's garments; and seventy-five per cent are " old " woolen materials purchased from wholesale junk dealers. Of the materials dealt in by the defendant B. D. Kaplan & Co., Inc., sixty per cent·are new wool " clips " and forty per cent are " old " wool materials acquired from like sources.

The defendants do not collect through their own agents the cast off overcoats, suits and other garments which comprise the old woolen materials in which they deal. These old materials are first a small part of that conglomerate mass of discarded stuff which is collected by licensed junk dealers from apartments, hotels, private homes and other sources and which is sold to licensed junk shops. There the mass is picked over and an assortment is made into metals, rubber, rags, paper and other types of refuse. The rags thus segregated are sold to licensed wholesale rag dealers who in turn separate wool from cotton, linen from silk, etc., until by the processes of segregation and sale, discarded woolen materials reach the wholesale wool dealer, to whom the defendants refer as " the wool stock man." It is this wholesale wool dealer — a licensed junk dealer — from whom the defendants buy the " old " woolen materials

which, as we have seen, comprise the major part of the defendants' stock in trade. Upon such sales the deliveries to the defendants' warehouses are in bulk lots, usually baled.

It thus appears that from the junk dealer, whose collections are made from the hotels and homes of a community or from trash barrels, to the wholesale wool dealer, who sells " old " woolen materials to the defendants, each dealer is a *licensed* junk dealer.

The defendants do not question the wisdom of requiring a license from each junk dealer who handles discarded waste materials until they reach the defendants' warehouses. Indeed, the defendants approve of such a requirement as a police measure. The defendants also expressly state that it is not the fact that their purchases of waste wool are in large quantities, which places them in a class of business which they claim to be beyond the power of regulation under the licensing statute. The reason for such exemption, it is argued, is the character of their business. It is said, and we agree, that the regulation of the junk business under police power is justified where its purpose and effect is to control a business which provides a market for stolen property. We do not agree, however, with the assertion that the materials in which the defendants deal are of a character which do not provide a market for stolen property and that accordingly the regulation of their businesses is both unnecessary and unreasonable.

The position taken by the defendants suggests the inquiry — what occurs in the transition of old woolen materials from the *licensed* wholesale wool dealer to the *unlicensed* defendants? What change, if any, takes place in materials thus delivered to the defendants which serves to exempt the defendants from the enforcement of the same licensing statute with which the wholesale wool dealer is required to comply? We find no evidence in the record which so differentiates vendor and vendee in that instance as to require of the former a license and to exempt the latter therefrom. Indeed the evidence is to the contrary.

There is evidence that when a discarded woolen overcoat, suit, sweater or other garment reaches the licensed wholesale wool dealer, the non-wool lining is usually torn out and it is the remaining woolen garment, stripped of non-wool trimmings, which goes into the bale and is delivered to the defendants. But it appears from testimony offered by the defendants that after they receive and unbale the materials delivered by the dealer —" there may be linings that the dealer has missed. We take them out. We take off the buttons. We take off the labels. * * * Then we in turn rebale them." There is also uncontradicted evidence that enough garments reach the defendants' warehouses to require each defendant to retain a corps of trimmers who cut up the woolen garments received from the dealers and trim off all non-wool materials.

Thus does the record make it clear that stolen garments, or garments which may form a part of essential proof in the prosecution of crime, may find their way into the defendants' warehouses as a part of the old woolen materials in which the defendants deal. These garments, whether intact or shorn of linings, may be identified as the subject of a theft, or may constitute evidence in the prosecution of a crime. We cannot say from the evidence before us that the business conducted by either defendant is of a character which exempts it from the licensing requirement of the statute here involved.

We also conclude that the word " rags " as used in the statutory definition of a junk dealer (Admin. Code, ch. 32, art. 18, § 32–113.0) includes the commodity dealt in by the defendants. In addition to evidence, to which reference has been made, that discarded wool garments comprise a large portion of the defendants' stock in trade, there is further testimony by the manager of one of the defendant companies as to whether old garments are " rags." After describing the work done by his company in cutting non-wool trimmings from the garments received from dealers, he was asked on direct examination: " Q. Then what do you do? A. We re-bale them. Q. What does that mean?

A. We put them in a press, either brown, green or blue or mixed, after they have been processed, and we make what we call a new bale of *rags* out of them. Q. Rags? A. That is the technical term. Q. Then what happens? A. Then they are shipped to a woolen mill. * * * Q. You just used the word rags * * * Does that word mean old garments in the industry. * * * A. Yes, it does. It means an old garment. That is the technical term that is used. Q. *Rags means garments?* A. *Yes.* Q. Doesn't it mean pieces of material that may have come from old garments which are used for further processing? A. Yes.

" By the Court: Q. *It covers both, cast away garments and also pieces of garments?* A. Yes." (Emphasis supplied.)

This definition of " rags " by a witness called by the defendants is an aid in interpreting the two newspaper advertisements, introduced by the People: an advertisement by the defendant Wool Company by which it held itself out as " Graders of Old and New Woolen Rags;" the other advertisement was by the defendant Kaplan Company, which described itself as prepared to furnish the trade with " Class ' A ' Old Worsted Rags."

We find in the record ample proof that the defendants were " engaged in the business of purchasing or selling * * * rags " within the statutory definition of a junk dealer.

The order of the Appellate Part of the Court of Special Sessions should be reversed and the judgments of the Magistrates' Court of the City of New York affirmed.

LOUGHRAN, FINCH, CONWAY and DESMOND, JJ., concur; LEHMAN, Ch. J., and RIPPEY, J., dissent.

Ordered accordingly.