THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, *v*. PERETZ NIERMAN, Defendant.

City Magistrate's Court of New York, Borough of Brooklyn, July 1, 1947.

*Sidney S. Hodes* and *Lester M. Friedman* for defendant.

*Charles E. Murphy, Corporation Counsel (M. W. Weiner* and *Saul Moskoff* of counsel), for plaintiff.

CANUDO, M. The complaint alleges that the defendant Nierman is engaged in the operation of a junk shop at 269 Ellery Street, in the borough of Brooklyn, city of New York, and that, having failed to obtain a junk dealer's license, he is conducting this shop in violation of section B32–114.0 of the Administrative Code of the City of New York, which provides (in paragraph a), that, "It shall be unlawful for any person to act as a junk dealer without a license therefor."

On May 16, 1947, Inspector Meltzer of the New York City Department of Licenses visited the premises operated by the defendant and his partner, where he found ten bales of *wool clips*, consisting of pieces of knitted fabrics of varying sizes, averaging about twenty square inches. The evidence discloses that the defendant and his partner, in the conduct of their business, purchase and collect from knitting mills pieces of wool which are left over in the manufacture of sweaters and other garments; that such pieces of wool — called wood clips — are then brought to their place of business, where they are sorted according to color and packed in bales, which in turn are sold to knitting mills which reprocess the wool clips into yarn and resell them to manufacturers. While the defendant admitted on cross-examination that some of the wool clips which came into his possession may previously have been reprocessed and may even have been in his possession before they had been reprocessed, the evidence discloses that (a) the activity in which the defendant is engaged involves the handling, for a profit, of *new* woolen materials only, and (b) the salvaging, sorting, baling and reprocessing all take place *before any part of such woolen materials reaches the ultimate consumer as part of a completed garment.*

Section B32–113.0 of the Administrative Code describes a " Junk Dealer " as " Any person engaged in the business of purchasing or selling junk, old rope, old iron, brass, copper, tin, lead, rubber, *rags,* bagging, slush or empty bottles." (Italics supplied.)

A " Junk Shop " is described, in the same section, as " The place of business of a junk dealer ".

The defendant, who deals only in *new* wool clips purchased directly from manufacturers, is not a junk dealer within the meaning of the Administrative Code. His activities are not specifically described in the statute. The only possible way, therefore, that he may be held to be a junk dealer would be by holding a new wool clip to be a rag, within the meaning of section B32–113.0 of the Code.

To support their contention that the wool clips in question must be characterized as " junk ", the People suggest that we reject the slang or colloquial expression and consider the accepted meaning of this word as defined by lexicographers and as its use must have been intended by the framers of section B32–114.0. To this end they cite the following definition of " junk " from Webster's New International Dictionary: " Old iron, or other metal, glass, paper, cordage, or other waste or discarded material which may be treated or prepared so as to be used again in some form."

Reference is then made by the People to the definition of the word " rag " in the same dictionary as " A waste piece of cloth torn or cut off; a tattered piece of cloth; a shred; tatter."

The People state that, within the latter definition, even a new piece of cloth becomes a rag when it is reduced to waste or shreds by some process. To support this contention they cite *Tenement House Department* v. *Hutkoff* (149 N. Y. S. 457), a civil action to recover a penalty for violation of section 39 of the then Tenement House Law, which provided that: " No tenement house, nor any part thereof * * * shall be used as a place of storage * * * of feed, hay, straw, excelsior, cotton, paper stock, feathers or rags." The court held that fragments of cloth consisting of new material were rags and, therefore, fell within the purview of that section.

Lexicography, which may be described as the art or process of compiling dictionaries, is far from an exact science. A dictionary is a book containing the words of a language, or of a department of knowledge, arranged alphabetically, defined and pronounced. It is a matter of common knowledge that while there can be no disagreement among dictionaries as to the alphabetical arrangement of words, there can be and there very frequently is disagreement between lexicographers as to the precise definition and pronunciation of many words which appear in all dictionaries. Let us turn, for example, to the

Funk & Wagnalls New Standard Dictionary, in which the word " junk " is defined as " Cast-off material of any sort that can be put to some use; odds and ends, as scrap-iron, old bottles, or paper." In the same dictionary we find that the word " rag " is defined as " A fragment of cloth, torn or partly torn from its original connection; especially a worn, frayed, or torn bit of a garment * * *." These definitions differ in some respects from the definitions of the same words cited by the People, and if a canvass were made of all the English dictionaries which by custom or because of academic recognition are accepted as authoritative, still other definitions of the same words would undoubtedly appear.

In *Tenement House Department* v. *Hutkoff* (*supra*, p. 460) the court quoted two dictionary definitions of the word " rag " and still a third definition which had appeared in a decision of another court, but added: " When the purpose of the section is considered, it seems * * * that the material which was stored and handled on these premises must be considered as rags. *The section was intended as a means of minimizing the dangers of fire in a tenement house.*" (Italics supplied.)

This language clearly indicated then, the court's belief that, in defining a word in a statute, consideration must be given to the purpose of the statute. The obvious purpose of section 39 was to reduce the hazards of fire in certain types of residential buildings. The court, very properly, did not ignore that aim in defining the word " rag ", and apparently gave due consideration to the fact that a piece of material would burn as quickly whether it had come directly from the mill in which it had been spun, or whether, before reaching the premises in question, it had been a part of wearing apparel or other finished products. The language in the *Hutkoff* case (*supra*) supports the proposition that, along with the lexicographer's definition of a word in a statute, courts must consider the legislative intent which may have led to the adoption of the statute.

Why do Legislatures provide for the regulation of junk dealers, and specifically, why does our Administrative Code provide that in a city of more than seven million people junk dealers must comply with licensing requirements and submit to supervision and regulation by an official city agency? The reason for regulation of this type is clearly and succinctly set forth in *Matter of Dening* v. *Cook* (162 Misc. 723, 724) in the statement that " The nature of the junk business as a market for stolen property makes it amenable to special regulation."

Further examination of the cases on the subject shows that statutes of this type have been held to be constitutional only because they represent a valid exercise of the police power. Except for this factor, they would involve regulation of a particular business and would deny equal protection of the law to the persons engaged in the junk business. That very issue arose in *People* v. *McGuire* (113 App. Div. 631, 632) where the following language was used by the Appellate Division in upholding the constitutionality of section 290 of the then Penal Code, which made it a misdemeanor for a junk dealer to purchase junk from a person under sixteen years of age: "It is evident that one of the objects of the statute is the prevention of stealing by children and to prevent their employment or agency in disposing of stolen property; but the Legislature, to effectuate those objects, deemed it necessary or advisable to prohibit junk dealers from purchasing such property from children under sixteen years of age."

In *People* v. *Rosenthal* (197 N. Y. 394, affd. *sub nom. Rosenthal* v. *New York*, 226 U. S. 260) the courts upheld the constitutionality of a section of the Penal Code which made a junk dealer liable to the charge of criminally receiving property if, "without ascertaining by diligent inquiry, that the person selling * * * [it] has a legal right to do so," he bought or received wire cable, copper, or similar materials belonging to a railroad, telephone, telegraph, gas or electric light company. The court said (p. 400): "The legislature had the power to confine the amendment to junk dealers, because they are way-wise and furnish the chief if not the exclusive market for stolen property."

Let us assume, for the sake of argument, that all the lexicographers agreed that the definition of the word "rag" included new wool clips. May we then say that, because the word "rag" appears in the statute defining junk dealers, this defendant must be considered a junk dealer? I think not. It is imperative that, in construing a regulatory statute of this type, which may be deemed constitutional only as an exercise of police power, we examine the reason for the existence of such regulation. In *City of New York* v. *Vandewater* (113 App. Div. 456), for example, the defendant was prosecuted in an action similar to the present one, under an ordinance of the City of New York which provided that "Any one dealing in the purchase and sale of junk, old rope, old iron, brass, copper, tin or lead, rags, slush or empty bottles shall be deemed to be a junk dealer and the place of business a junk shop." Citing

*City of Duluth* v. *Bloom* (55 Minn. 97), *City of Grand Rapids* v. *Braudy* (105 Mich. 670) and *Marmet* v. *State* (45 Ohio St. 63), the Appellate Division in its opinion pointed out that (p. 457): " The likelihood that junk may have been pilfered or stolen is the reason for the restriction, location or regulation of dealers therein." The defendant in that action was a dealer in scrap iron and steel, and was engaged in purchasing bulky articles like boiler tubes, axles, car wheels, switches, tracks, crossings, steel frames of buildings, sections of elevated railroad fabrics and of bridges, and other similar materials which were shipped by him to mills and furnaces. The court held that (p. 458): " * * * such a traffic is not that of a junk dealer ", and added: " The fact that a thing is composed of old iron or old steel does not make it junk. *It is the size and character of the article rather than its composition that must determine whether it is within that term.* It may not be easy to define the term because it covers nondescript articles, but it is not difficult to determine whether an article is within it. * * * There is a radical difference between the buyer of great masses of metal weighing tons at a time * * * and one who may buy old bottles, scraps or pieces of metal, slush, old rope and the like, *which might readily be pilfered or stolen and carried away to be secretly sold by the culprit.* It is the business of this character that is to be licensed, located, regulated and made subject to the scrutiny of the police authorities." (Italics supplied.)

I am convinced that examination of any statute ever adopted by a Legislature for the regulation of junk dealers will disclose, as did the various statutes cited above, that the basic reason for such regulation has always been the desire of the lawmaking body to eliminate or at least minimize the opportunity for theft on the part of persons who have access to the household belongings of others and the opportunity to dispose of such belongings in such a manner as to destroy their original form. The undisputed facts in the case now before this court show that at no time before they come into the hands of the defendant do these wool clips comprise any part of a completed garment. It is equally important to stress the fact that the defendant purchases these materials directly from the manufacturer before they have been offered to the ultimate consumer in any form at all.

Section B32–114.0 of the Administrative Code was in issue, also, in *People* v. *American Wool Stock Corp.* (286 N. Y. 77) which also involved the question as to whether dealers in wool clips were required to obtain licenses as junk dealers. The first

defendant in that case purchased 75% of its wool clips as " old " woolen materials, from wholesale junk dealers, while the second defendant purchased 40% of its materials from like sources. The Court of Appeals in that case pointed out that (p. 79) " Experience has taught that the various types of property dealt in by a junk dealer are peculiarly susceptible to theft and that the business of junk dealers, which provides a market for stolen property, is of a character which warrants regulation in the exercise of police power." Referring to the " old " materials collected by the defendants for a substantial part of their wool clips, the court said (pp. 80–82) : " These old materials are first a small part of the conglomerate mass of discarded stuff which is collected by licensed junk dealers from apartments, hotels, private homes and other sources and which is sold to licensed junk shops. * * * It * * * appears that from the junk dealer, whose collections are made from the hotels and homes of a community or from trash barrels, to the wholesale wool dealer, who sells ' old ' woolen materials to the defendants, each dealer is a *licensed* junk dealer. * * * the record make[s] it clear that stolen garments, or garments which may form a part of essential proof in the prosecution of crime, may find their way into the defendants' warehouses as a part of the old woolen materials in which the defendants deal. These garments * * * may be identified as the sub-ject of a theft, or may constitute evidence in the prosecution of a crime."

The present case is clearly distinguishable, on its facts, from the *American Wool Stock Corporation* case (*supra*), where a substantial part of the wool clips came from garments which had been in public use. There is no necessity to protect from the activities of the defendant or anyone with whom he deals, the householders, apartment dwellers and others whose gar-ments, without proper regulation, might through theft or dis-honest dealing find their way into junk shops.

The new wool clips found in the defendant's premises were no more " rags " under the meaning of article 18 of title B of chapter 32 of the Administrative Code than the boiler tubes, car wheels, axles, tracks, frames of buildings and other mate-rials involved in *City of New York* v. *Vandewater* (113 App. Div. 456, *supra*) were " old iron, brass, copper, tin or lead " under the regulatory statute involved in that case. Here, as in the *Vandewater* case (*supra*), and in any other case where the two conflict, the interpretation of the lexicographer must yield to the intent of the Legislature.

I find the defendant Peretz Nierman not guilty.